Jesse RHODES

v.

**Norman J. COOKSON et al.**

Supreme Judicial Court of Maine.
Argued March 13, 1986.
Decided May 20, 1986.

Eaton, Glass, Marsano & Woodward, Lee Woodward, Jr. (orally), Belfast, for plaintiff.

Thiem & Williams, Susan C. Thiem (orally), Camden, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, and GLASSMAN, JJ.

McKUSICK, Chief Justice.

Plaintiff Jesse Rhodes appeals from a judgment entered in favor of defendants Norman and Jeanine Cookson after a non-jury trial in Superior Court (Waldo County). On March 22, 1982, Mr. Rhodes, then 91 years of age, and his wife, Hope, then

83, conveyed their home in Belfast, subject to a reserved life estate, to their next door neighbors, the Cooksons, in exchange for the Cookson's contractual commitment to "assist [the Rhodeses] in the normal daily necessities." A year and a half later Mrs. Rhodes died, and in December 1983 Mr. Rhodes brought this present action seeking cancellation of the deed only on the grounds that the Cooksons obtained the conveyance through fraud and undue influence, and that the Cooksons had failed to perform their contractual commitment. The Superior Court found against him on all three grounds. On appeal, Mr. Rhodes does not contest the trial court's finding of absence of fraud or undue influence, but he continues to claim a breach of contract on the part of the Cooksons. Specifically, he argues that the Superior Court erred in construing the scope of the Cooksons' obligations to the Rhodeses under the deed and that the court's finding of fact that the Cooksons had discharged those contractual duties was clearly erroneous. We reject both arguments and affirm the judgment of the Superior Court.

From the testimony and exhibits admitted at trial the Superior Court found the essential facts as follows:

The plaintiff Jesse Rhodes is a widower and is 94 years old. In 1944 he and his late wife Hope purchased a house and real estate [as joint tenants] on Lincolnville Road in Belfast. The Rhodeses made the property their home until Hope died in September 1983 at the age of 84. Jesse continues to live there in the marital home.... Even in their later years the Rhodeses have been active and fiercely guarded their independence.

Despite their personal desire and ability to do for themselves, to conduct their own affairs and to tend to daily chores, there came a time in March of 1982 when Hope developed a concern for the future and who would assist them in their daily tasks "when they got old."

Hope initially approached the defendant Norman Cookson, who had been a neighbor for 6 or 7 years, to see if the Cooksons would be willing to care for the Rhodeses, assist them in their daily needs and look in on them to assure their well being. In exchange for this care and assistance the Rhodeses would deed their property to the Cooksons, reserving a life estate for themselves. Mrs. Rhodes initiated this action even though there had not been a particularly close relationship between the parties prior to this time.

Norman Cookson subsequently spoke to his wife [Jeanine] concerning the situation and together they went back to Hope and agreed to her wishes. Mrs. Rhodes instructed Mr. Cookson to get in touch with her attorney in Belfast. Even though Mrs. Rhodes made the selection of legal counsel in this matter, this attorney had represented both parties in the past on other occasions and went to substantial lengths to be sure that all parties understood his relationship in this matter and advised them orally and by letter.... Additionally, this attorney met with the Rhodeses separately from the Cooksons to ascertain exactly what they wanted and to fully explain to them the consequences of their action....

On March 22, 1983, counsel met with the parties at the Rhodeses' home for the closing. Again, counsel continued his efforts to make sure that the Rhodeses were fully aware of the situation and that they were signing the deed knowingly, voluntarily and understandingly.

The deed ... conveys the plaintiff[s'] primary residence on Lincolnville Avenue in Belfast to the defendants in joint tenancy. The deed specifically reserves "a certain life estate in Jesse M. Rhodes and Hope B. Rhodes or the survivor, for and during the term of their natural life." In exchange for this property and as consideration from the defendants to the Rhodeses, the deed contains the following language:

The grantees herein, Norman J. Cookson and Jeanine E. Cookson, by acceptance of this deed, hereby *agree to as-*

*sist in the normal daily necessities of Jesse M. Rhodes and Hope B. Rhodes including but not necessarily limited to the providing of a wood supply, grounds upkeep and other similar actions.*

Subsequent to the signing of the deed the Rhodeses continued to live a substantially independent lifestyle and did not want to rely upon other people to provide for them. For this reason the assistance provided by the Cooksons was necessarily limited. . . .

. . . .

The relationship between the Rhodeses and Cooksons was fairly amicable and proceeded without any major problems until Mrs. Rhodes passed away in September 1983. Shortly thereafter, apparently after conversations with some relatives, the plaintiff forb[ade] the defendants from entering or otherwise coming upon his property and physically locked them out of the premises.

(Emphasis added)

### I.

Mr. Rhodes' first contention on appeal is that the Superior Court erred in construing the contractual obligations of the Cooksons, in light of our decision in *Thompson v. Glidden*, 445 A.2d 676, 678 (Me.1982). In *Thompson* we held that a mortgage taken back by an elderly grantor from a grantee to secure the latter's promise of support must be liberally construed in favor of the elderly grantor. *Id.* In following that teaching of *Thompson*, the Superior Court in the case at bar found implicit in the Cooksons' contractual undertaking "to assist in the normal daily necessities of Jesse M. Rhodes and Hope B. Rhodes" a requirement that they perform that assistance "to the satisfaction of the grantors," i.e., the Rhodeses. Mr. Rhodes, however, complains that in construing the deed the trial court failed to read into it *verbatim* the same implicit promise on the part of the grantees to attend to the "peace, harmony, and emotional well being" of the elderly

grantor that we found existed in the factual circumstances of *Thompson*. *Id.*

■ The *Thompson* case, as well as the case authority from other jurisdictions on which it relied, involved factual situations fundamentally different from that of the present case. In those cases the arrangement for which the elderly grantors bargained involved their living with the grantees in the home conveyed to the grantees, who were then to provide live-in care and support in exchange for the conveyance. From such circumstances, where the contracting parties expect to reside together, courts "have recognized that in addition to the explicit promise of physical well being there is also an implicit promise of peace, harmony, and emotional well being." *Id.; see also* Annot., 112 A.L.R. 670, 708 (1938). In the present case, in contrast, the Rhodeses contracted only for *assistance* from their *neighbors*, the Cooksons, and retained for their lifetimes the ownership and exclusive occupancy of their home. As the trial court found, the Rhodeses were fiercely independent people who merely wanted to insure that they would have someone to help them in the future should they need it. Thus the nature of the contract in this case does not demand the interpretation given the contract in *Thompson*.

■ The Superior Court on the present record had a sound basis for concluding that the Rhodeses' "peace, harmony, and well being" never came into issue—at least at no time until Mr. Rhodes found he could not undo the completed transaction. In any event, even assuming that that issue had been generated by the evidence in this case, we find that the Superior Court's construction of the Cooksons' duties to require them to be performed to the satisfaction of the Rhodeses adequately meets any implicit *Thompson*-type requirement. Requiring the Cooksons to render assistance in a way to satisfy the Rhodeses themselves automatically assures that the Cooksons will be bound to perform their contractual duties consistently with the

Rhodeses' "peace, harmony, and well being." Thus Mr. Rhodes fails to persuade us that the Superior Court's construction of his deed gives him any basis for prevailing on his present appeal. He has received as favorable a construction of his own deed as *Thompson* gives him any right to expect.

## II.

■ Appellant's second and final argument on appeal is that the finding by the Superior Court that the Cooksons had discharged their obligations under the deed was clearly erroneous. The testimony in the record on appeal, however, fully supports the trial court's finding of fact that the Cooksons complied with the deed provisions (as construed liberally in favor of the Rhodeses), except to the extent that they were prevented from doing so by Mr. Rhodes himself.

Mr. Cookson testified that he provided wood for the Rhodeses, and that he had reshingled the backside of the house, had hired someone to work on the chimney, had replaced the planking in the garage, had put up a run for the dog, and had installed storm windows and a well pump. Jesse Rhodes had never complained at any time about the workmanship of these projects. In fact, he had approved of it.

Mrs. Cookson described to the court the care she had given Mrs. Rhodes in her final illness. She helped Mrs. Rhodes with her rectal medication, and sat and visited with her at her bedside. She sat up with Mrs. Rhodes all night once when she was in particularly severe pain. During that period of Mrs. Rhodes' final illness, she also cooked for Mr. Rhodes. In addition, the Cooksons every day brought over the paper and spent time checking on and visiting with the Rhodeses.

Finally, the trial court was justified in finding that it was Mr. Rhodes who locked the Cooksons out and refused to let them continue performing their duties under the deed. The Cooksons still wished to perform. "Where the grantor ... prevents performance on the part of the grantee,

without any fault on the part of such grantee who remains willing and able to carry out the agreement, the grantor is not entitled to cancel the deed conveying his property to the grantee in consideration of his support." 73 Am.Jur.2d *Support of Persons* § 17, at 902 (1974). Although Mr. Rhodes told the trial court that the Cooksons supplied him with rotten wood and did not perform to a satisfactory level, the trial court chose to believe the testimony of the Cooksons. The court found, and the evidence fully justified it in finding, that Mr. Rhodes *was* subjectively satisfied with the work done by the Cooksons and that it was only later, after his wife's death, that he changed his mind about the whole transaction and went to court to get his property back. Since matters of credibility and the drawing of inferences from the evidence are left to the finder of fact, we cannot say that the Superior Court's findings were clearly erroneous. M.R.Civ.P. 52(a); *Harmon v. Emerson*, 425 A.2d 978, 981–82 (Me.1981).

The entry is:

Judgment affirmed.

All concurring.